UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

JRB PERSONNEL, LLC, AND JRB     Case No. 16-cv-_____
PERSONNEL, LLC GROUP
HEALTH PLAN,     Honorable _____

      Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

      Defendant.

---

## COMPLAINT

Plaintiffs, JRB Personnel, LLC ("JRB"), and JRB Personnel, LLC Group Health Plan (hereafter referred to as the "Plan"), by and through their counsel, Varnum LLP, hereby state as their Complaint against Defendant Blue Cross Blue Shield of Michigan ("BCBSM") as follows:

## NATURE OF ACTION

1.     JRB entrusted BCBSM to administer its self-insured employee benefit Plan.  Pursuant to their contract, JRB sent large sums of money to BCBSM, which BCBSM was supposed to use to pay employee health care claims.  JRB recently learned that, contrary to their contract and numerous specific claims reports, BCBSM also skimmed additional administrative fees from the Plan assets JRB provided on behalf of the Plan to pay claims.  BCBSM's misappropriation of Plan

assets is a clear violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* In fact, as explained below, BCBSM's scheme has already been adjudicated by the United States Court of Appeals for the Sixth Circuit as fraudulent and unlawful. Plaintiffs bring this suit to recover the misappropriated funds and obtain all other relief to which they are entitled.

## PARTIES, JURISDICTION AND VENUE

2.      JRB is a Michigan limited liability company, with its principal location in Saginaw, Michigan.

3.      The Plan is JRB's ERISA-governed benefit plan. JRB and the Plan are hereafter collectively referred to as "Plaintiffs."

4.      During all relevant times, BCBSM was a Michigan non-profit health care corporation organized under the Nonprofit Health Care Corporation Reform Act, MCL 550.1101, *et seq* (the "Act").

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 because Plaintiffs' claims arise under ERISA.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because BCBSM resides in the Eastern District of Michigan. Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2).

## GENERAL ALLEGATIONS

7.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

8.     JRB is an employee leasing company.  JRB, as Plan sponsor, also contracted with BCBSM on behalf of the employees of Duro-Last, Inc.

9.     JRB offers health care benefits through the Plan.  Rather than buy health insurance to cover employee health care claims under the Plan, during the relevant time period JRB has opted to self-insure.  As such, JRB paid the actual employee health care costs covered by the Plan, up to a large threshold.  JRB bought "stop loss" insurance to cover claims that exceeded that threshold.

**A.     2013:  First "Hidden Fees" Trial (*Hi-Lex v. BCBSM*) Results in a Judgment Against BCBSM for 100% of Hidden Fees.**

10.     This case is nearly identical (factually and legally) to *Hi-Lex Controls, Inc., v. BCBSM*, No. 11-cv-12557 (E.D. Mich.), the first Hidden Fees case to proceed through trial.  Following a nine day bench trial in the *Hi-Lex* case, the Honorable Victoria A. Roberts issued Findings of Fact and Conclusions of Law that were sixty-three pages long (the "*Hi-Lex* FFCL"), awarding the *Hi-Lex* plaintiffs 100% of the claimed Hidden Fees, pre-judgment interest back to 1994, and attorneys' fees.

11.     While *Hi-Lex* was the first Hidden Fees case to go to trial, it was not the first such case in this Court.  The original Hidden Fees case is *Pipefitters Local*

*636 Insurance Fund v. BCBSM*, No. 04-73400 (E.D. Mich.), which was filed on September 1, 2004.  On July 18, 2013, the Sixth Circuit Court of Appeals issued its unanimous, published opinion in *Pipefitters* holding that BCBSM was an ERISA fiduciary and that BCBSM violated ERISA by charging the very same fee at issue here to its self-insured, Administrative Service Contract ("ASC") customers.  *Pipefitters Local 636 Ins. Fund v. BCBSM*, 654 F.3d 618 (6th Cir. 2011).

12.     Following the decision in *Pipefitters*, on May 14, 2014, the Sixth Circuit Court of Appeals issued its unanimous, published opinion in *Hi-Lex*, affirming this Court's decision.  *Hi-Lex Controls, Inc. v. BCBSM*, 751 F.3d 740 (6th Cir. 2014), *cert. denied* 135 S.Ct. 404 (Oct. 20, 2014).  The Sixth Circuit in *Hi-Lex* relied heavily on its prior decision in *Pipefitters*, noting that *Hi-Lex* "involves the same ASC, same defendant, and same allegations" as its decision in *Pipefitters*.  *Id.* at 750.

13.     Because this case is identical to *Hi-Lex* in all material respects, where appropriate, Plaintiffs will refer to the *Hi-Lex* FFCL and the *Hi-Lex* Opinion.

**B.     <u>JRB Contracted with BCBSM to Administer Its Self-Insured Plan.</u>**

14.     The framework for the relationship between JRB and BCBSM was contained in the ASC.  The ASC was a boilerplate document drafted by BCBSM, and it set forth the purported rights and responsibilities of each party with regard to BCBSM's administration of the Plan.

15.    Upon information and belief, the ASC between JRB and BCBSM was executed by the parties effective January 1, 1990.

16.    Pursuant to the ASC, BCBSM agreed to administer the Plan by paying covered employee health care claims on behalf of the Plan, using money provided to it by JRB.

17.    The obligations of the parties were outlined in the ASC:  The parties agreed that BCBSM would process and pay, and JRB would reimburse BCBSM for all Amounts Billed related to Enrollees' claims.

18.    "Amounts Billed" is defined in the ASC as the amount JRB owes in accordance with BCBSM's standard operating procedures for payment of Enrollees' claims.

19.    "Enrollees" are defined in the ASC as Employees and dependents of Employees who are eligible and enrolled for Coverage.

20.    In exchange for its services, BCBSM was entitled to an administrative fee.

21.    The ASC did not contain any pricing terms.  Rather, the specific fees to be paid by JRB in exchange for the administrative services provided by BCBSM were enumerated in a "Schedule A."  Together, the ASC and Schedule A formed the parties' contract.

22.    The ASC was renewed year after year by the parties.

**C.**    **Plaintiffs Provided BCBSM With Plan Assets, Which Were Controlled by BCBSM and Supposed to be Used to Pay Covered Employee Claims.**

23.    Under the ASC, Plaintiffs were required to prepay the pro rata cost of estimated Amounts Billed for that quarter, the pro rata cost of the estimated administrative charge for that contract year, and the amount BCBSM determined was necessary to maintain the prospective hospital reimbursement funding for that contract year.

24.    The specific prepay amounts to be paid by Plaintiffs were dictated by the Schedule A's.

25.    Under the ASC, BCBSM was required to provide Plaintiffs with "a detailed settlement showing Amounts Billed to and owed by JRB during the prior available Quarter including any surplus or deficit amounts."

26.    The quarterly settlements were used to adjust the future prepay amounts upward or downward depending on whether employee health care claims were higher or lower than what JRB had previously prepaid.

27.    Pursuant to the terms of the ASC, as renewed, JRB sent the required prepayments to a BCBSM-owned bank account, on a periodic basis.

28.    The prepayments sent to BCBSM's bank account were "Plan Assets" as defined by ERISA. *Hi-Lex* FFCL, at ¶¶ 5, 6, & 180; *Hi-Lex,* 751 F.3d at 745-46.

29.     BCBSM had complete authority and control over the bank account and the Plan Assets sent to it by JRB.

30.     BCBSM (1) exercised discretionary authority and control with respect to management of the Plan; (2) exercised authority and control with respect to management and disposition of Plan Assets; or (3) had discretionary authority and responsibility in the administration of the Plan.  *Hi-Lex* FFCL, at ¶¶ 180-82; *Hi-Lex*, 751 F.3d at 744-47.

## D.     BCBSM Illegally Skimmed Additional Administrative Compensation From the Plan Assets Entrusted to It.

31.     Plaintiffs have recently learned that starting in 1994, BCBSM implemented a scheme to secretly obtain more administrative compensation than it was entitled to.

32.     The scheme is outlined in the *Hi-Lex* case and also in an internal BCBSM memo obtained from that litigation.  *See* **Exhibit 1**.

33.     The catalyst for BCBSM's scheme is that in 1987 and 1988, BCBSM was in poor financial shape.  *Hi-Lex* FFCL, ¶ 9.

34.     BCBSM started charging self-funded customers subsidies and surcharges:  the "Plan-Wide Viability Surcharge," "Other Than Group Subsidy," and "Group Retiree Surcharge."  *Id.* at ¶ 10.

35.     The customer response to the new fees was resoundingly negative.  *Id.* at ¶ 11.   BCBSM received "tremendous complaints from customers," in part

stemming from the fact that "[t]he billing of these amounts to customers was an add-on to the bill, ***highlighted for all to see.***"  *Id.*

36.     BCBSM could not convince its customers that the subsidies and surcharges were fair.  *Id.* at ¶ 12.

37.     The charges were so unpopular that, in 1989 alone, BCBSM lost 225,000 members.  *Id.* at ¶ 13.

38.     Many other customers refused to pay the fees.  *Id*. at ¶ 14.

39.     According to BCBSM, the fees made it a "challenge to maintain customer relationships."  *Id.* at ¶ 16.  By disclosing the fees, BCBSM was "its own worst enemy."  *Id*.

**E.     1993-1994: BCBSM's Plan to Hide Fees**

40.     In 1993, a simple solution to the problem was proposed.  Executives suggested replacing the disclosed fees with hidden fees buried in marked-up hospital claims (the "Hidden Fees").  *Id*. at ¶ 17.

This solution offered several advantages to BCBSM:

Reflecting certain BCBSM business costs in hospital claim costs will provide long-term relief to the problems detailed above and will also satisfy short-term objectives of enhancing customer relationships while cutting operational costs.  Inclusion of these costs in our hospital claim costs is actually more reflective of the actual savings passed on to customers as it will now include the hospital savings net of the costs incurred to provide these savings.  This will also improve our operations efficiencies since mass mailings for subsidy amount changes will no longer be necessary.  ***Changes to these costs will be inherent in the system and no longer visible to the customer.  The***

8

> *same argument applies to risk charges and provider related*
> *expenses*.

*Id.* at ¶ 19 (emphasis added).   BCBSM's senior management approved this

proposal.  *Id.* at ¶ 22.

43.    The program was known as "retention reallocation."  *Id.*; *Hi-Lex,* 751

F.3d at 743.

42.    The term "retention" refers to money BCBSM retains, as opposed to

money used to pay medical claims.  *Hi-Lex* FFCL, at ¶ 26.

43.    The scheme worked as follows:   regardless of what BCBSM was

required to pay a hospital, BCBSM reported a larger charge that was passed on to

the customer.  *Hi-Lex*, 751 F.3d at 743.  BCBSM kept the additional amount as

hidden administrative compensation:

| | |
|---|---|
| Actual Claim Paid to Hospital: | $6,000 |
| Add-On For Hidden Fees Kept by BCBSM: | <u>$810</u> |
| Hospital Claim Reported to Plaintiff: | $6,810 |

*Id*.

44.    But BCBSM did not stop there.  It also shifted the cost associated with

maintaining its network (internally known as "Network Access Fee") to the Hidden

Fees. *Hi-Lex* FFCL, at ¶ 25.

45.    Previously, BCBSM had included the Network Access Fee in the

disclosed administrative fee. *Id.* at ¶ 12.

46.     This scheme offered several advantages to BCBSM, one being the Hidden Fees (per a BCBSM executive summary) would be "inherent in the system and ***no longer visible to the customer***."  *Id.* at ¶ 19.

47.     Not only did the subsidies and surcharges disappear from customer bills, but BCBSM was able to lower its disclosed administrative fee (by shifting the "Network Access Fee"), giving the illusion that it was more cost competitive, without actually giving up any revenue.

48.     Collectively then, the Hidden Fees consisted of four components.  The "Other Than Group" subsidy, "Contingency/Risk" surcharge, the "Retiree" surcharge, and the "Network Access" fee. *Id.* at ¶¶ 25 & 27.

49.     This hidden administrative compensation was in addition to the disclosed "Administrative Fee" described in each Schedule A.

50.     This program went into effect in October 1993.  *Id.* at ¶ 22.

51.     The Hidden Fees were determined unilaterally by BCBSM.  *Id.* at ¶ 31; *Hi-Lex*, 751 F.3d at 750.

52.     BCBSM's cost accountants and actuaries decided how much to recoup through the Hidden Fees and how much hospital claims had to be marked up to reach that goal.  *Hi-Lex* FFCL, at ¶ 31; *Hi-Lex*, 750 F.3d at 750.

53.    Internal BCBSM documents confirm that it had complete discretion in setting the amount of the Hidden Fees, as well as which customers paid them.  *Hi-Lex* FFCL, at ¶ 33; *Hi-Lex,* 750 F.3d at 750.

54.    BCBSM changed the Hidden Fees at its whim or waived them entirely for customers who discovered them.

## F.    1994-Present: BCBSM Employed a Bevy of Artifices to Hide the Fees

55.    Following the implementation of "retention reallocation," BCBSM went to great lengths to ensure that the Hidden Fees were not disclosed and would remain invisible to its customers.  *Hi-Lex* FFCL, at ¶ 35.

### 1.    Form 5500 Certifications

56.    Each year, BCBSM provided customers (including Plaintiffs) with a certification to complete their Form 5500, which is filed with the U.S. Department of Labor.  *Id.* at ¶ 66; *Hi-Lex,* 751 F.3d at 746.

57.    The Department of Labor, Internal Revenue Service, and Pension Benefit Guaranty Corporation developed Form 5500's to satisfy annual reporting requirements under ERISA and the IRS Code.  *Hi-Lex* FFCL, at ¶ 67.

58.    BCBSM carefully crafted its Form 5500 certification to hide the Hidden Fees.  *Id.* at ¶ 76.

59.     Portions of the Hidden Fees should have been, *but were not*, reported in one or more of the lines on the worksheet.  *Id.* at ¶ 73; *Hi-Lex,* 751 F.3d at 748 n. 11.

60.     For example, the "OTG subsidy," was a subsidy BCBSM claimed was mandated by the State of Michigan.  *Hi-Lex* FFCL, at ¶ 25(c).

61.     BCBSM should have reported the amount of the OTG subsidy on Line 9(c)(i)(D) of the Form 5500 certification, titled "OTHER EXPENSES (MANDATED SUBSIDY)."  *Id.* at ¶ 69.

62.     But BCBSM consistently reported zero for this item, even though it took and kept millions of dollars from its self-funded customers.  *Id.* at ¶ 71.

63.     The same is true of the "Contingency/Risk" surcharge used to improve BCBSM's reserves.  *Id.* at ¶ 25(b).

64.     BCBSM should have reported this fee on Line 9(c)(i)(F), titled "RISK AND CONTINGENCY."  *Id.* at ¶ 69.

65.     BCBSM consistently reported "Not Applicable" for this item, despite taking millions of dollars in contingency.  *Id.* at ¶ 71.

66.     None of the other components of the Hidden Fees were reported by BCBSM in the proper locations on the certification.  *Id.*; *Hi-Lex,* 751 F.3d at 748 n. 11.

67.    There were, however, lines for "Administration" (Line 9(c)(i)(B)) and "Other Retention" (Line 9(c)(i)(G)) on the certification. *Hi-Lex* FFCL, at ¶ 71.

68.    Of the amounts retained by BCBSM, the only ones disclosed to Plaintiffs in the Form 5500 certification were the disclosed Administrative Fee and stop-loss fee.

69.    A reader reviewing the Form 5500 certifications could not determine whether any Hidden Fees were charged or in what amount. *Hi-Lex* FFCL, at ¶ 72; *Hi-Lex*, 751 F.3d at 748.

70.    As a result, Plaintiffs were misled into believing that BCBSM retained far less administrative compensation than it, in fact, actually retained. *Id.*

## 2.    <u>Quarterly Settlements</u>

71.    BCBSM sent Plaintiffs quarterly reports containing details about the plan's performance. *Id.* at ¶ 39.

72.    The reports did not show the amount—or even the existence—of the Hidden Fees. *Hi-Lex* FFCL, at ¶¶ 40-44.

73.    BCBSM carefully crafted false quarterly reports to make it appear to customers like Plaintiffs that (1) the claims paid to providers (e.g. hospitals) were higher than they actually were and (2) they were paying far less to BCBSM for administrative fees than they actually were. *Id.*

74.     BCBSM accomplished this by reporting the Hidden Fees as hospital claims on the line for "TOTAL CLAIMS EXPENSE" rather than as administrative fees on the line for "TOTAL ADMINISTRATIVE FEE EXPENSE." *Id.*

75.     BCBSM did this even though it has admitted that the Hidden Fees were "administrative compensation." *Id.* at ¶ 47.

### 3.     Renewal Documents

76.      BCBSM provided misleading claims data in the "Provider Contract Savings Report" at the time of contract renewal. *Id.* at ¶¶ 51-55.

77.     The report hid the Hidden Fees in numerous ways:

- Overstating the amount paid to healthcare providers on Plaintiffs' behalf (by including the Hidden Fees kept by BCBSM);

- Understating the amount of discounts offered by providers (by excluding the Hidden Fees kept by BCBSM); and

- Overstating the amount of "claims expenses passed on to your group" (by including Hidden Fees kept by BCBSM). *Id.*

78.     Also, BCBSM misrepresented that its reported "Administrative Fee is all-inclusive." *Id.* at ¶ 56; *Hi-Lex*, 751 F.3d at 749.

79.     The amount BCBSM reported as the Administrative Fee did not include the Hidden Fees, which were additional (hidden) administrative compensation. *Hi-Lex* FFCL, at ¶ 57.

### 4. __Annual Settlements__

80.    Each year, BCBSM sent Plaintiffs an annual settlement.

81.    This report included a section titled "Administrative Fee Settlement"; however, BCBSM did not include the Hidden Fees in that section. *Hi-Lex* FFCL, at ¶ 62.

82.    Instead, BCBSM reported only the administrative fee that was reflected in each Schedule A. *Id.* at ¶ 60.

83.    The annual settlement also reported "Actual Claims Paid by BCBSM." *Id.* at ¶ 61-62.

84.    Despite the use of the terms "actual" and "paid," the actual claims amount was increased to include the Hidden Fees kept by BCBSM. *Id.* at ¶¶ 61-65.

85.    BCBSM knew this was false and misleading because the Hidden Fees were administrative compensation kept by BCBSM, not benefit claims paid to a healthcare provider. *Id.* at ¶ 62.

86.    Reading the statement, it would be impossible for a BCBSM customer to determine whether Hidden Fees were charged, or in what amount. *Id.* at ¶ 64.

87.    An underwriter for BCBSM admitted that, through this practice, BCBSM "would be overstating [the] true cost of [a] claim." *Id.* at ¶ 63.

**G.**   **2004-2007: BCBSM Debated Whether to Disclose the Hidden Fees**

88.    Starting around 2004, BCBSM executives raised concerns about the lack of disclosure surrounding the Hidden Fees, leading to an internal debate. *Id.* at ¶ 120.

89.    A snapshot of this debate was captured in a 2004 email between BCBSM employees: "If we want to counter that perception [that we hide fees] and retain our credibility, we must be willing to disclose all our fees and stand behind them." *Id.* at ¶ 122.

90.    The BCBSM new-business sales staff opposed disclosure because, by revealing its true compensation to customers, the resulting administrative fees would be too high and BCBSM could not compete. *Id.* at ¶ 123.

91.    BCBSM's true intentions are shown by the evolution of a proposed renewal exhibit that starts with a numeric disclosure of the Hidden Fees and is watered down over time to the point where all line items for Hidden Fees and any monetary reference are removed. *Id.* at ¶ 125.

92.    BCBSM senior underwriter Ken Krisan was responsible for coming up with a strategy for "disclosing" the Hidden Fees without customers actually noticing. *Id.* at ¶ 126.

93.    His own emails confirm that actual disclosure of the Hidden Fees was not BCBSM's intent:

- "I think there is a need [to] ***downplay*** this [Hidden Fees] with respect to the outside world … [corporate communications] may be helpful in developing some internal training materials or job aids that puts the proper 'spin' on what we want to say." *Id.* at ¶ 126 (emphasis in FFCL).

- "We want to keep this a little on the ***understated*** side so we don't want to include this in any mass communications. ***In many cases this is not going to [be] good news***." *Id.* at ¶ 126 (emphasis in FFCL).

- "[B]ecause we want to ***downplay*** the release of this information, it was decided that Agents and Customers should not receive any written materials." *Id.* at ¶ 126 (emphasis in FFCL).

- "The [Hidden] Fee portion of the discussion is intended to be ***downplayed*** to the customer. … There is no plan to provide anything to customers or agents on this topic." *Id.* at ¶ 126 (emphasis in FFCL).

- "We want to stay away from identifying what is in the fee." *Id.* at ¶ 126.

## H.   BCBSM Investigation Showed That ASC Customers Did Not Know About the Hidden Fees

94.    In 2007, BCBSM internally investigated whether any customers knew they were paying Hidden Fees. *Id.* at ¶¶ 133-35.

95.     The results were startling.  BCBSM's own employees reported that a staggering 83% of self-insured ASC customers with January renewals did not know about the fees.  *See id*; *Hi-Lex,* 751 F.3d at 750.

96.     The results of BCBSM's formal investigation were consistent with anecdotal accounts from BCBSM employees:

- Ken Krisan, Director of Middle Group Underwriting:  "The [Value of Blue] report will identify the [Hidden] Fee which for most groups is something new."  *Id.* at ¶ 136.

- Kenneth Bluhm, Director of Financial Accounting:  "[N]ot all ASC groups are aware of BCBSM's [Hidden Fees]."  *Id.* at ¶ 136.

- James Bobak, Manager of Large Group Underwriting:  "I know many of the smaller [groups] aren't aware [of hidden fees]."  *Id.* at ¶ 136.

- Christine Farah, Vice President of Sales:   "I agree that there is overwhelming confusion on [hidden] fees internally (and externally)."  *Id.* at ¶ 136.

- Ken Krisan:  "[I]t is not certain [some accounts] were aware of the [hidden] fees when entering into the arrangement."  *Id.* at ¶ 136.

97.     Plaintiffs now believe that BCBSM charged them Hidden Fees since at least 1994.  In fact, Plaintiffs have obtained a letter written by BCBSM wherein BCBSM admitted that the Hidden Fees "have been in place for Local ASC groups

since 1994." *See* **Exhibit 2**.  To the extent BCBSM charged Plaintiffs Hidden Fees

prior to this time, Plaintiffs also seek recovery related to those prior years.

**I.      BCBSM Violated the ASC and Schedule A's by Charging the Hidden Fees.**

98.     Plaintiffs never agreed to pay the Hidden Fees, and the purported

disclosures in the contract documents were false and misleading.  *Hi-Lex*, 751 F.3d

at 748.

**1.      The Schedule A's Are Misleading**

99.     BCBSM previously argued that it was allowed to assess the Hidden

Fees because of an amorphous "disclosure" included in some Schedule A's.  For

the year 2005, for example, the  so-called "disclosure" read:

> Your hospital claims cost reflects certain charges for provider network
> access, contingency, and other subsidies as appropriate.

100.   This sentence is false and misleading, and did not disclose the Hidden

Fees (*Hi-Lex* 751 F.3d at 748):

- The first page of that Schedule A has a heading entitled "Administrative

  Charge."    It was under this heading that BCBSM's administrative

  compensation was to be disclosed.   Plaintiffs expected all fees paid to

  BCBSM to be included in this section of the Schedule A.  The Hidden Fees

  were "administrative compensation" and were not noted.  *Hi-Lex* FFCL, at ¶

  140; *Hi-Lex*, 751 F.3d at 747.

- The sentence omits the critical fact – that Plaintiffs would be paying these fees as additional administrative compensation to BCBSM. *Id.* Just the opposite, the language stated that the identified items would be "reflected" in the "hospital claims cost." "Hospital claims cost" is the cost paid ***to*** hospitals for services rendered. Thus, the "disclosure" represented that the amounts "ordered by the Insurance Commissioner" would be ***paid to*** the hospitals. In reality, the fees were ***not*** included in the claims paid to the hospitals – they were additional administrative compensation ***retained by BCBSM***. *Hi-Lex* FFCL, at ¶ 140.

101. BCBSM itself recognized that its contracts were confusing and that its "customers probably don't completely understand the Access Fees." *Id.* at ¶ 141.

## 2. The ASC Was Misleading

102. BCBSM also previously argued that the ASC disclosed the Hidden Fees, but the Court of Appeals concluded that this cited language was "opaque and misleading" (*Hi-Lex*, 751 F.3d at 748):

> The Provider Network Fee, contingency, and any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant to 1980 P.A. 350 will be reflected in the hospital claims cost contained in Amounts Billed.

103. The placement of this language was carefully chosen by BCBSM. The ASC contains a heading called "Financial Responsibilities," under which it says the customer will "pay BCBSM the total of the following amounts…." The

"following amounts" are then identified in a ***numbered list*** of specific obligations (*e.g.*, administrative fees, late fees, and interest).

104. ***Not one of the nine enumerated obligations includes Plaintiffs paying Hidden Fees***. *Hi-Lex* FFCL, at ¶ 143.

105. By not including Hidden Fees in the enumerated list of financial obligations of the customer, BCBSM effectively represented that the Hidden Fees were NOT something to be paid by the customer to BCBSM. *Id.*

106. Next, the "disclosure" represented the fees as "ordered by the State Insurance Commissioner." *Id.* at ¶ 144; *Hi-Lex*, 751 F.3d at 748.

107. This was a misrepresentation in three respects: (1) it is untrue; the Insurance Commissioner never ordered any BCBSM customers to pay these fees, nor would the Insurance Commissioner have had that authority in the first place (*Hi-Lex,* 751 F.3d at 748 ); (2) by characterizing the fees as something "ordered" by state government, BCBSM represented that these were NOT any kind of compensation for it, but rather some kind of fee imposed by the State, although, these Hidden Fees were kept by BCBSM as additional administrative compensation; and (3) BCBSM disavowed any claim that it was ordered to collect the OTG subsidy from Plaintiffs in a brief to the Sixth Circuit. *Hi-Lex* FFCL, at ¶ 144.

108.   This language also refers to "Amounts Billed."  "Amounts Billed" is defined as "the amount the Group owes in accordance with BCBSM's standard operating procedures *for payment of Enrollees' claims*."  *Id.* at ¶ 145.

109.   The definition of "Amounts Billed" does not include fees paid to BCBSM.  *Id.*; *Hi-Lex*, 751 F.3d at 748.

110.   Additionally, the ASC, at Art. IV, B1 "Scheduled Payments," identifies seven payments to be made pursuant to the Schedule A.  None of the seven include the Hidden Fees.  Further, by itemizing payments "listed in Schedule A," BCBSM represented that there were no other payments, and consequently, Plaintiffs would not have understood the subject language in the Schedule A to be referring to more fees.  *Hi-Lex* FFCL, at ¶ 146.

111.   Further, even to the extent that the contract documents provide some hint about additional fees, those documents describe only what *might* happen in the future.  *Hi-Lex*, 751 F.3d at 748.

112.   Every year, however, Plaintiffs received DOL 5500 certification sheets from BCBSM which purported to show the administrative compensation that BCBSM was *actually* receiving.  *Id.* The 5500 Forms, though, falsely indicated that BCBSM was not retaining any administrative compensation beyond that clearly delineated in the ASC and Schedule As.  *Id*.

113. BCBSM's strategy of secrecy worked as planned and Plaintiffs were unaware that they had been charged Hidden Fees since the beginning of the ASC arrangement.

114. Plaintiffs were not on actual or constructive notice that BCBSM was charging the Hidden Fees, despite the exercise of reasonable diligence on their part.

115. Moreover, the Sixth Circuit already has held that a similarly situated, hypothetically diligent plaintiff would not have discovered BCBSM's Hidden Fees scheme. *Hi-Lex*, 751 F.3d at 749-50.

116. In fact, "BCBSM committed fraud by knowingly misrepresenting and omitting information about the [Hidden] Fees in contract documents. *Id.* at 748.

## J. BCBSM Engages in a Similar Illegal Scheme by Overstating Physician/Professional Claims

117. An extensive factual record of BCBSM's wrong doing with regard to illegal mark-ups of hospital claims has been developed in the *Hi-Lex* case.

118. During the *Hi-Lex* litigation, Plaintiffs learned of another illegal scheme: BCBSM intentionally overstated physician/professional claims as part of a program known as the Physicians Group Incentive Program ("PGIP").

119. Under the PGIP, BCBSM added a fee, internally called "Physician Incentive," to the amount charged by a professional, resulting in an increased charge to Plaintiffs. These additional fees were not reported to Plaintiffs at all.

Rather, they were secretly buried within the amounts reported as professional claims expense.

120.   In other words, BCBSM took portions of Plaintiffs' ERISA Plan Assets that were supposed to be used to pay the professionals that provided services to covered beneficiaries, and instead BCBSM used those funds for its own benefit and at its own discretion.

121.   The amounts collected as PGIP payments were not paid to professionals that provided services to Plaintiffs, and BCBSM has not otherwise explained how it used those payments.

122.   The PGIP was directly contrary to the parties' self-funded arrangement, under which Plaintiffs were to pay the actual amount of healthcare claims incurred under the Plan, plus an administrative fee to BCBSM to compensate it for its administrative services.  To the extent BCBSM had physician incentives, or other programs, those were  provided by BCBSM in exchange for the administrative fee.  Those were  not costs to be separately (and certainly not secretly) recovered from Plaintiffs.

123.   The PGIP was not disclosed in the ASC, nor in Plaintiffs' Schedule A's.

124.   When confronted with these allegations, BCBSM responded that it was allowed to assess the PGIP because of an amorphous "disclosure" included in some Schedule A's.  For the year 2007, the so-called "disclosure" read:

> The Group acknowledges that BCBSM or a Blue Cross and Blue Shield Plan may have compensation arrangements with providers in which the provider is subject to performance or risk-based compensation, including but not limited to withholds, bonuses, incentive payments, provider credits and member management fees. Often the compensation amount is determined after the medical services has been performed and after the Group has been invoiced.

This "disclosure" said nothing about BCBSM retaining a portion of Plaintiffs' ERISA Plan Assets in an amount unilaterally determined by it, and then paying out those monies (if at all) to professionals unilaterally determined as deserving by BCBSM.  Instead, it referred to "BCBSM" having compensation arrangements with providers, which at best suggests that BCBSM would be compensating the providers out of its own pocket.

125.   Further, nothing in the alleged disclosures explained how much the PGIP would be or how it would be calculated.

126.   Likewise, nothing in the Schedule A's indicated that Plaintiffs agreed to pay the PGIP.  In fact, BCBSM's charging of the PGIP was inconsistent with the ASC, which specifically identified JRB's payment obligations, none of which included paying the PGIP.

127.  The so-called "disclosures" of the PGIP were, at best, ambiguous and misleading, and like the Hidden Fees disclosures, were similarly "opaque."

128.  In fact, it is clear that the PGIP scheme is nearly identical to the Hidden Fees scheme.  And like the Hidden Fees scheme, the PGIP scheme violates ERISA because, among other things, BCBSM unilaterally determined the PGIP payments, secretly took these payments from Plaintiffs, and then mis-reported its use of Plan Assets.

129.  Further, to the extent BCBSM used Plaintiffs' Plan Assets to its benefit, that also constitutes illegal self-dealing under ERISA.

130.  Consequently, all of the above-described fees, charges, subsidies and surcharges, including the PGIP and Physician Incentive, are hereafter collectively referred to as "Hidden Fees."

## COUNT I
## BREACH OF FIDUCIARY DUTY – ERISA

131.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

132.  BCBSM was a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) with respect to the Plan because (1) it exercised discretionary authority and control over management of the Plan; (2) it exercised authority and control over management and disposition of Plan Assets (*Hi-Lex* FFCL, at ¶ 182; *Hi-Lex*, 751 F.3d at 744-47;

or (3) it had discretionary authority and responsibility in the administration of the Plan.

133.   JRB is a fiduciary because it exercised discretionary authority and control over management of the Plan.

134.   As a fiduciary, BCBSM was required to, among other things, discharge its duties solely in the interest of the employees and beneficiaries of the Plan, preserve Plan Assets, fully disclose its actions and any compensation it was taking for its services, avoid making false or misleading statements, and abide by any statutory obligations or restrictions imposed on it.

135.   BCBSM breached its fiduciary duties by, among other things:

    (a)    Charging the Hidden Fees;

    (b)    Failing to disclose the Hidden Fees;

    (c)    Submitting false and misleading quarterly settlement statements and annual summaries;

    (d)    Submitting false and misleading Form 5500 reports; and

    (e)    Otherwise engaging in a pattern of conduct designed to mislead, confuse, deceive and otherwise trick Plaintiffs into paying more for its services than Plaintiffs were obligated to pay.

136.   BCBSM's breach of its fiduciary duty has proximately caused substantial damages to Plaintiffs.

137.   BCBSM fraudulently concealed that it was charging the Hidden Fees, the amount of those fees, and that it was otherwise violating its legal obligations to Plaintiffs.  *Hi-Lex* FFCL, at ¶¶ 233-49; *Hi-Lex*, 751 F.3d at 748-50.

138.   Plaintiffs did not discover the full extent of BCBSM's wrongful conduct until learning of the pending Hidden Fees litigation.

## COUNT II
## PROHIBITED TRANSACTION UNDER ERISA

139.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

140.   BCBSM is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) and a "party in interest" pursuant to 29 U.S.C. § 1002(14).

141.   As a fiduciary and party in interest, BCBSM was prohibited from engaging in certain transactions as set forth in 29 U.S.C. § 1106.

142.   BCBSM's conduct with respect to the Hidden Fees was a prohibited transaction because, among other things, (a) it constituted a transfer to, or use by or for the benefit of, BCBSM of Plan Assets, and (b) BCBSM dealt with Plan Assets in its own interest and for its own account.  *See Hi-Lex* FFCL, at ¶ 201; *Hi-Lex,* 751 F.3d at 750-51.

143.   BCBSM's violation of 29 U.S.C. § 1106 has proximately caused substantial damages to Plaintiffs.

144.   BCBSM fraudulently concealed that it was charging the Hidden Fees, the amount of those fees, and that it was otherwise violating its legal obligations to Plaintiffs. *Hi-Lex* FFCL, at ¶¶ 233-49; *Hi-Lex*, 751 F.3d at 748-50.

145.   Plaintiffs did not discover the full extent of BCBSM's wrongful conduct until learning of the pending Hidden Fees litigation.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court to enter judgment in their favor and against BCBSM as follows:

A.   Ordering BCBSM to provide a full and complete accounting of all Hidden Fees received by it from Plaintiffs;

B.   Declaring that BCBSM breached its fiduciary duty and otherwise violated federal law by (1) charging the Hidden Fees, (2) failing to disclose or report the Hidden Fees, and (3) submitting false and misleading quarterly settlements, annual settlements and Form 5500's, and otherwise acting through a pattern of deception;

C.   Awarding restitution to Plaintiffs of the Hidden Fees;

D.   Awarding monetary damages, costs, interest, disgorgement of BCBSM's profits, and attorneys' fees (including statutory attorneys' fees under ERISA) to the fullest extent of the law; and

E.   Awarding all other relief to which Plaintiffs may be entitled.

VARNUM LLP
Attorneys for Plaintiffs


Date: February 11, 2016       By:    */s/ Aaron M. Phelps*
                                     Aaron M. Phelps (P64790)
                              Business Address & Telephone:
                                     Bridgewater Place, PO Box 352
                                     Grand Rapids, MI, 49501-0352
                                     Phone:  (616) 336-6000
                                     Fax:  (616) 336-7000
                                     amphelps@varnumlaw.com

10109736_1.DOC